**OREGON NATURAL RESOURCES COUNCIL FUND and Hells Canyon Preservation Council, Plaintiffs,**

v.

**Harv FORSGREN, Karyn Wood, and United States Forest Service, Defendants,**

and

**D.R. Johnson Lumber Company, Defendant–Intervenor.**

**No. CV 02–368–BR.**

United States District Court, D. Oregon.

March 11, 2003.

Marc D. Fink, Peter M.K. Frost, Western Environmental Law Center, Eugene, OR, for Plaintiffs.

Michael W. Mosman, United States Attorney, Jeffrey K. Handy, Assistant United States Attorney, Val J. McLam Black, Special Assistant United States Attorney, Office of General Counsel, United States Department of Agriculture, Portland, OR, for Defendants.

Scott W. Horngren, Julie A. Weis, Haglund Kirtley Kelley Horngren & Jones LLP, Portland, OR, for Defendant–Intervenor.

## OPINION AND ORDER

BROWN, District Judge.

This matter comes before the Court on the Motion for Summary Judgment and Injunctive Relief (# 61) filed by Plaintiffs Oregon Natural Resources Council Fund and Hells Canyon Preservation Council and the Motion for Summary Judgment (# 67) filed by Defendants Harv Forsgren, Karyn Wood, and United States Forest Service. Defendant–Intervenor D.R. Johnson Lumber Company joins in Defendants' Motion relating to Plaintiffs' challenge to Defendants' management of the Canada lynx (lynx) in the Wallowa–Whitman National Forest (Forest) in Northeast Oregon.

The Court heard oral argument on January 14, 2003, regarding the parties' pending Motions. The Court has completed its consideration of these arguments and reviewed the memoranda of the parties, Defendant–Intervenor D.R. Johnson Lumber Company, and *amicus curiae* Pacific Legal Foundation and Wallowa–Whitman National Forest Property Owners.

For the reasons that follow, the Court **GRANTS IN PART** Plaintiffs' Motion for Summary Judgment and Injunctive Relief as to their First Claim brought under the National Forest Management Act of 1976 (NFMA), 16 U.S.C. § 1600, *et seq.*, and their Second Claim brought under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.*, to the extent those claims constitute specific challenges to the following pending timber sales: the McCully Restoration Projects, the Sandy Bottle Restoration Project, and the Little Bear Project. Accordingly, the Court hereby enjoins Defendants from all activities in furtherance of these timber sales pending compliance with the procedural requirements of NFMA and NEPA. The Court's resolution of Plaintiffs' Motion with regard to these three timber sales renders moot Plaintiffs' Third Claim brought under the Endangered Species Act (ESA), 16 U.S.C. § 1531, *et seq.* The Court otherwise **DENIES** Plaintiffs' Mo-

tion for Summary Judgment and specifically denies Plaintiffs' request for injunctive relief on a broad, programmatic basis against the Wallowa–Whitman Land and Resource Management Plan (Forest Plan).

The Court also **GRANTS IN PART** Defendants' Cross–Motion for Summary Judgment based on the Court's lack of subject-matter jurisdiction to consider the Lone Dog Project. The Court DENIES Defendants' Cross–Motion in all other respects.

## BACKGROUND

### A. *Management of the Lynx.*

Unless otherwise noted, the following facts relating to the management of the lynx in the Forest are undisputed.

The lynx is a wild cat that ranges in temperate forests, including those in the Cascade Range in Washington and Oregon and in the Rocky Mountains. The lynx preys on snowshoe hares found in areas with deep snow. The lynx's preferred denning habitats are mature forests that contain large woody debris such as lodgepole pine, spruce, and subalpine forests.

In 1990, the United States Fish & Wildlife Service (FWS) listed the lynx as a "sensitive" species. In 1998, the FWS published a proposed rule listing the lynx as a "threatened species" under the ESA. In March 2000, the FWS published a final rule listing the lynx as threatened in several regions, including the Cascade Range of Oregon and Washington and the Rocky Mountain states.

In 1990, the Forest Service (FS) completed an environmental impact statement (EIS) and promulgated the Forest Plan to manage the Forest in Oregon. The EIS did not include any specific management standards or directions to protect the lynx even though the FS knew the lynx used forest habitat.

In 1998, after the FWS proposed an ESA listing of the lynx, the FWS, FS, National Park Service (NPS), and Bureau of Land Management (BLM) participated in informal conferences under the direction of an interagency Lynx Steering Committee (Steering Committee) to assess conservation issues relating to the lynx. The FS began mapping suitable lynx habitat and used information on elevation, canopy cover, stand structure, and plant association to highlight lynx habitat. FS and FWS biologists refined the maps based on personal knowledge of the Forest, including information on reliable lynx sightings and snow depth. The FS and FWS biologists divided potential lynx habitat into primary habitat (which included Engelmann spruce, subalpine fir, and lodgepole pine) and secondary habitat (which included silver fir and mountain hemlock).

In April 1999, the Steering Committee produced two primary scientific documents: The Scientific Basis for Lynx Conservation (Science Report) and a draft Lynx Conservation Assessment and Strategy (LCAS). The Science Report was a compendium and interpretation of current scientific knowledge by experts on the lynx, its primary prey, and its habitat. The Science Report served as the scientific foundation for interagency activities involving the lynx. In the LCAS, the Steering Committee identified the risks to the lynx that might occur as a result of federal land-management activities and recommended conservation measures that could be taken to remove or to minimize those risks. The Steering Committee developed the LCAS to provide a consistent and effective approach to conservation of lynx on all federal lands.

In May 1999, pursuant to the LCAS, each national forest was required to begin mapping Lynx Analysis Units (LAU) with

the understanding that new information might require mapping revisions.

In December 1999, the FS and BLM prepared a nationwide Biological Assessment in which they determined their plans failed to meet some of the evaluation criteria for the lynx. The FS and BLM recommended amendment or revision of the plans to incorporate conservation measures that would reduce or eliminate adverse effects to the lynx.

On February 7, 2000, the FS entered into a Conservation Agreement with the FWS to include in forest plans the measures necessary to conserve the lynx. The FS agreed any necessary changes to forest plans would be made through amendments and revisions in accordance with NFMA, including NEPA disclosures and public participation.

On March 24, 2000, the FWS published its final rule in which it designated the lynx as a threatened species under the ESA effective April 24, 2000.

On August 22, 2000, the Steering Committee, which included FS representatives, issued a Lynx Habitat Mapping Direction (new mapping direction) to all regional foresters and supervisors requiring them to review existing lynx habitat maps to ensure their consistency with certain criteria. Foresters are required to identify that portion of primary and secondary lynx habitat that falls within an LAU. The new mapping direction, however, specifically narrows the definition of lynx habitat by designating subalpine fir as the only primary lynx habitat. Foresters are to consider only isolated primary habitat islands within the LAUs as lynx habitat. According to the new mapping direction, only projects within the primary habitat islands of LAUs are subject to LCAS conservation measures and consultation procedures under the ESA. Thus, foresters may consider the location of historic or recent lynx sightings or occurrences only for the purpose of determining whether lynx habitat is within an LAU.

In August 2000, the Steering Committee issued a second edition of the LCAS (Revised LCAS) that included the criteria described in the new mapping direction. The Steering Committee issued the revision without public participation or any NEPA analysis or procedure.

On October 25, 2000, the FWS issued its Biological Opinion regarding the effects of National Forest Land and Resource Management Plans and BLM Use Plans on Canada lynx in the contiguous United States. The FWS concluded the current Plans implemented in conjunction with Conservation Agreements were not likely to jeopardize the continued existence of the lynx. The "no jeopardy" conclusion was based on continued implementation of the Conservation Agreements "until such time Plans are amended or revised to consider the needs of the lynx." Administrative Record (Admin.R.) 1434. The FWS further concluded the Plans were not likely to jeopardize the continued existence of the lynx if the FS amended or revised the Plans to incorporate the conservation measures in the LCAS.

Nonetheless, the new mapping direction and Revised LCAS generated concern among FS and FWS biologists. On November 1, 2000, wildlife biologists for seven national forests in Oregon, excluding the Forest, sent a letter to the FS Regional Office expressing their concern that none of the forests would have sufficient amounts of subalpine fir plant associations to identify LAUs if primary vegetation was limited to the subalpine fir. Foresters, therefore, would be unable to identify or to designate any lynx habitats for conservation under the LCAS. The biologists were concerned they would not be able to meet their obligations under the ESA or the

Conservation Agreement under the new mapping direction.

On April 10, 2001, Region 1 of the FWS issued a "White Paper" in which it noted "the majority of the Cascades Geographic Area ... and portions of the Rocky Mountain Geographic Area in Oregon" fall outside the boundaries of designated LAUs and, therefore, are not subject to the LCAS conservation measures under the new mapping direction. Admin. R. 1593. In the White Paper, the FWS expressed concern that the changes in habitat mapping direction by the FS would result in a failure to identify all potential lynx habitat areas and to conserve lynx in areas where sightings have occurred but have not been studied sufficiently.

The Steering Committee reviewed the White Paper and unanimously concluded on December 19, 2001, that the White Paper did not provide evidence the lynx were more widespread or abundant than originally thought. The Steering Committee also concluded the White Paper did not contain sufficient substantive evidence, data, or biological interpretations to form a basis for changing the current direction for mapping lynx habitat or for amending the LCAS or its implementation.

The only programmatic documents regarding lynx that the FS has subjected to public review and comment under NEPA or NFMA are the 1990 Forest Plan and its accompanying forest environmental impact statement (FEIS). The Revised LCAS, the Conservation Agreement, and the new mapping direction were completed without any public involvement through the notice and comment procedures of NEPA or NFMA.

On March 21, 2001, the FS issued a schedule for responding to the recommen-dation that amendment or revision of forest plans are necessary for national forests that contain lynx habitat. Although many of the forests in the Northern and Southern Rocky Mountains Geographic Area decided to amend their plans, the forests in the Cascade Mountains Geographic Area and the Oregon portion of the Northern Rocky Mountains Geographic Area decided instead to revise their plans in 2004 and complete the revisions by 2008 at the earliest.

### B. The Timber Sales.

Plaintiffs challenge the three timber sales[1] described below on the ground the FS erroneously relied solely on the Revised LCAS and new mapping direction when it concluded in its Biological Assessments that the lynx would not be harmed by the sales.

#### 1. McCully Restoration Projects.

The McCully Restoration Projects include a timber sale, road management plan, prescribed burn plan, and restoration plan. The McCully Projects also include the commercial thinning of 791 acres and the pre-commercial thinning of almost 1,300 acres.

The FS divided the McCully Projects into two phases. Phase One includes only those acres with activities outside of core lynx habitat. Eighty-five percent of the total acres planned for commercial thinning (675 of the 791 acres) and 1,275 acres of the 1,300 acres planned for pre-commercial thinning are included in Phase One. The remaining 116 acres of commercial thinning and 23 acres of pre-commercial thinning also fall outside of core lynx habitat. These areas, however, cannot be accessed without reconstructing a forest

---

1. For the reasons set forth later in this Opinion and Order, the Court has dismissed Plaintiff's challenge to the fourth timber sale, the Lone Dog Vegetation Management Project, for lack of subject matter jurisdiction.

road. Although the reconstructed segment also would fall outside of core lynx habitat, the existing road crosses core habitat.

On May 8, 2001, the FS issued its Biological Assessment for the McCully Projects. The FS concluded implementation of Phase One of the McCully Projects would not affect the lynx or their habitat because the McCully Projects are entirely outside of core lynx habitat. The FS indicates it will issue a separate decision on Phase Two (which includes core lynx habitat) after consultation with FWS.

On May 10, 2001, the FS issued its Decision Notice and Finding of No Significant Impact (FONSI) regarding the McCully Projects. The Decision Notice applied only to Phase One of the McCully Projects. Plaintiffs filed appeals on the McCully Projects, which the FS denied on August 28, 2001.

### 2. *Sandy Bottle Restoration Project.*

The Sandy Bottle Project included the commercial harvest of 1,394 acres. Before the Steering Committee issued the Revised LCAS and new mapping direction, a FS wildlife biologist explained at an Interdisciplinary Team Meeting held on September 16, 1999, that the lynx may pose a "potential issue" with the Sandy Bottle Project. The biologist reported the Sandy Bottle Project area would consist of mostly primary lynx habitat with some secondary habitat.

The FS issued the Sandy Bottle Biological Assessment on February 23, 2001. The FS based the Biological Assessment on the Revised LCAS and new mapping direction. The FS concluded the Sandy Bottle Project would have no effect on the lynx or lynx habitat, none of the proposed activities were within lynx habitat, and none of the proposed activities would impact lynx habitat directly or indirectly.

On August 23, 2001, the FS issued its Decision Notice and FONSI for the Sandy Bottle Project. Plaintiffs filed appeals of the project, which the FS denied on February 1, 2002.

### 3. *Little Bear Project.*

On June 7, 2001, the FS signed the Decision Notice to proceed with the Little Bear Project and authorized 7.0 miles of road reconstruction, 1.4 miles of new temporary road, and the cutting of trees on 1,163 acres to include 1,001 acres of ground-based yarding. The FS acknowledges the Little Bear Project falls within a LAU, but the FS contends the Little Bear Project will be modified "to ensure consistency with" the Revised LCAS.

## STANDARDS

### A. *Summary Judgment.*

Fed.R.Civ.P. 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 919 (9th Cir.2001). In response to a properly-supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial. Fed.R.Civ.P. 56(e).

All reasonable inferences from the facts in the record must be drawn in favor of the nonmoving party. *Hensley v. Northwest Permanente P.C. Ret. Plan & Trust,* 258 F.3d 986, 999 (9th Cir.2001). A mere disagreement about a material issue of fact, however, does not preclude summary judgment. *Jackson v. Bank of Haw.,* 902 F.2d 1385, 1389 (9th Cir.1990). When the nonmoving party's claims are factually implausible, that party must come forward

with more persuasive evidence than otherwise would be required. *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1147 (9th Cir.1998) (citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir.2000). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.[2] *Arpin*, 261 F.3d at 919.

### B. Administrative Procedures Act.

The Administrative Procedures Act (APA), 5 U.S.C. § 551, *et seq.*, provides an agency decision may be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard is appropriate for resolution of factual disputes that require substantial agency expertise. *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir.2000). Review under this standard is narrow, and the reviewing court may not substitute its judgment for that of the agency. *See United States Postal Serv. v. Gregory*, 534 U.S. 1, 122 S.Ct. 431, 434, 151 L.Ed.2d 323 (2001). The agency, however, must articulate a rational connection between the facts and the law in its findings and conclusions. *See Midwater Trawlers Co-op v. Dep't of Commerce*, 282 F.3d 710, 716 (9th Cir.2002). Thus, the reviewing court must determine whether the decision was based on a consideration of the relevant factors and whether the decision was a clear error of judgment. *Hells Canyon Alliance v. United States Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir.2000). For example, the court may reverse if the agency relied on factors that Congress did not intend the agency to consider, failed to consider an important aspect of the issue, offered an explanation for its decision in contradiction of the evidence before the agency, or made a determination so implausible that it could not be ascribed to a mere difference of opinion or the product of the agency's expertise. *See Pacific Coast Fed. of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001). The inquiry, although narrow, must be searching and careful. *Ninilchik*, 227 F.3d at 1194.

The court generally must defer to an agency's interpretation of its own regulations. *Friends of the Cowlitz and CPR–Fish v. FERC*, 253 F.3d 1161, 1166 (9th Cir.2001). The court must defer to the agency unless the agency's construction is clearly erroneous or inconsistent with the plain meaning of the regulations. *Partridge v. Reich*, 141 F.3d 920, 923 (9th Cir.1998). The court does not have to defer to the agency, however, when the agency is merely advancing a litigation position rather than formulating an official interpretation. *United States v. Trident Seafoods*, 60 F.3d 556, 559 (9th Cir.1995).

### DISCUSSION

### A. Jurisdictional Challenges.

#### 1. Standing.

Defendants argue Plaintiffs initially failed to file any declarations in support of their Motion for Summary Judgment to show they have standing to sue, which they also failed to do when they filed their Motion for a Temporary Restraining Order.

On May 28, 2002, when the Court heard argument regarding Plaintiffs' Motion for a Temporary Restraining Order, the Court requested Plaintiffs to submit a

---

**2.** The parties appear to agree legal issues predominate and no genuine issues of material fact exist sufficient to preclude summary judgment.

memorandum addressing the standing issue. Plaintiffs filed a Memorandum and the Declaration of Erik Ryberg. Based on the Memorandum and Declaration, the Court overruled Defendants' objections to Plaintiffs' standing.

Plaintiffs now have filed two additional declarations in connection with their Motion for Summary Judgment in support of standing. Defendants have not offered any new objections to Plaintiffs' standing. Accordingly, the Court concludes Plaintiffs have established their standing to bring this action.

### 2. Plaintiffs' Failure to Exhaust Administrative Remedies on the Lone Dog Project.

Exhaustion of administrative remedies is a jurisdictional prerequisite to the maintenance of this action. *Kleissler v. United States Forest Serv.,* 183 F.3d 196 (3d Cir. 1999).

Defendants contend Plaintiffs did not appeal the FS decision on this sale. Plaintiffs concede they do not have any evidence that the FS received or acted on any Oregon Natural Resources Council appeal relating to the Lone Dog Project. Accordingly, the Court concludes it lacks jurisdiction to review any issues raised by Plaintiffs relating to the Lone Dog Project.

### 3. Plaintiffs' Failure to Give Notice of Improper Segmentation of the McCully Projects.

Defendants and Defendant–Intervenor initially asserted Plaintiffs failed to give the FS adequate notice of Plaintiffs' argument that the segmentation of the McCully Projects into two phases violated the consultation requirements of § 7 of the ESA. Defendants now concede Plaintiffs gave the necessary notice. Defendants, therefore, have withdrawn their opposition to Plaintiffs' Motion on this ground.

### B. Plaintiffs' First Claim: Violation of NFMA.

NFMA requires the Secretary of Agriculture to "develop, maintain, and as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). The FS must assure the forest plans provide for "multiple use and sustained yield of products and services . . . and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e). In providing for multiple uses, the forest plan must comply with the substantive requirements of NFMA that are designed to ensure continued diversity of plant and animal communities. 16 U.S.C. § 1604(g)(3)(B). To ensure compliance with NFMA and the forest plan, the FS must conduct an analysis of each site-specific action it undertakes.

NFMA requires the FS to prepare "one integrated plan for each unit of the National Forest System, incorporating in one document or one set of documents, available to the public at convenient locations, all of the features required by this section." 16 U.S.C. § 1604(f)(1). After final adoption, the FS must revise the forest plans periodically and amend them "in any manner whatsoever after final adoption of the plan." 16 U.S.C. § 1604(f)(4),(5). To make significant plan amendments, NFMA mandates public involvement comparable to that required during the initial adoption of the plan. *Id.*

### 1. Count 1—Procedural Challenge Under NFMA.

During oral argument, Plaintiffs clarified they specifically are seeking injunctive relief on the three remaining timber sales at issue. Plaintiffs allege Defendants are implementing a Revised LCAS and a new mapping direction as part of a revised lynx

management strategy either by (a) *de facto* amendment of the standards and guidelines of the Forest Plan or (b) failing to act to amend the Forest Plan before implementing the Revised LCAS and the new mapping direction, without public notice, in violation of NFMA. Plaintiffs argue the *de facto* amendment or, in the alternative, the failure of the FS to act to amend the Forest Plan constitutes "final agency action" that is ripe for review because certain site-specific projects will have a direct and harmful effect on the lynx.

Regardless of Plaintiffs' characterization of Count 1, Defendants contend Count 1 is a non-justiciable, programmatic challenge to the Forest Plan, which is the kind of challenge the Supreme Court rejected in *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998), and its progeny. In addition, Defendants assert the decision to revise rather than to amend the Forest Plan is within the discretion of the FS. By revising the LCAS and implementing the new mapping direction, which are the FS actions at the heart of this case, Defendants maintain the FS merely is gathering and using the best science available to develop and to maintain the Forest Plan. In any event, Defendants argue the best science, which is internally developed by the FS and not subject to public scrutiny, adequately protects the viability of the lynx. According to Defendants, the actions of the FS were merely part of its day-to-day management responsibilities over the national forests, are within the discretion of the FS, and are not significant enough to require the procedural safeguards of public notice and participation.

■ The first question, therefore, is whether the issuance of the Revised LCAS and new mapping direction constitutes "final agency action" that is reviewable under the APA. *See* 5 U.S.C. § 704. "The finality requirement is concerned with whether the initial decision-maker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." *Darby v. Cisneros*, 509 U.S. 137, 144, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). The Supreme Court has applied a two-part analysis to determine whether an agency action is final pursuant to the APA: (1) the action must mark the "consummation" of the agency's decision-making process and may not be merely tentative or interlocutory and (2) the action must be one "by which rights or obligations have been determined" or "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

■ Defendants and Defendant–Intervenor argue the Revised LCAS and new mapping direction are not ripe for review and are not final agency actions. The Court disagrees.

Defendants and Defendant–Intervenor rely on *Ohio Forestry* and *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), to support their arguments. In *Ohio Forestry*, the Supreme Court held a programmatic challenge to a forest plan that had not been implemented through any site-specific project was premature and not ripe for review. The Court explained the forest plan itself did not require anyone to do anything: It did not give anyone a legal right to cut trees nor did it abolish anyone's legal right to object to the cutting of trees. 523 U.S. at 733, 118 S.Ct. 1665. In other words, the plan would not inflict significant practical harm at that point in the process. *Id.* The Court noted the plaintiff would "have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain." *Id.* at 734, 118 S.Ct. 1665. Such later challenge "might also include a challenge to the lawfulness of the present Plan

if (but only if) the present Plan then matters, *i.e.,* if the Plan plays a causal role with respect to the future, then-imminent, harm from logging." *Id.*

In *Lujan,* the issue was whether the BLM's land-withdrawal program was a final agency action. The plaintiff asserted generally that the BLM's reclassification of some withdrawn lands and the return of others to the public domain would open the lands to mining activities and destroy the natural beauty of the lands. The plaintiff alleged the BLM's "withdrawal program" (a term the plaintiff chose) violated the Federal Land Policy and Management Act (FLPMA) and NEPA by failing to develop, to maintain, and, when appropriate, to revise land-use plans that provide by tracts or areas for the use of public lands. This alleged program included at least 1,250 individual classification terminations and withdrawal revocations. The Supreme Court noted the land withdrawal review program that the plaintiff complained about did "not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations." 497 U.S. at 890, 110 S.Ct. 3177. The program was merely the plaintiff's name for the continuing and constantly changing day-to-day operations of the BLM. As such, the Court held the program was not an "identifiable" agency action and, therefore, not a final agency action for purposes of the APA. *Id.* at 899, 110 S.Ct. 3177. Similarly, in *Ecology Ctr., Inc. v. United States Forest Serv.,* the court held the FS's failure to perform certain day-to-day monitoring tasks relating to a forest plan did not constitute "final agency actions" subject to judicial review under the APA. 192 F.3d 922, 925–26 (9th Cir.1999). Defendants in this case contend the revision of the LCAS and the new mapping direction are simply part of the day-to-day management operations of the FS similar to the actions of the agencies in

*Lujan* and *Ecology Center* and are not subject to judicial review.

At oral argument, Plaintiffs addressed the issue of non-justiciability. Plaintiffs distinguished *Ohio Forestry* by emphasizing they specifically seek injunctive relief in their First Claim relating to the specific timber sales even though the First Claim includes a programmatic challenge to the Forest Plan itself as an integral part of the site-specific challenge. Plaintiffs contend the FS is implementing the timber sales in reliance on its Biological Assessments, which, in turn, were based on the Revised LCAS and new mapping direction. As noted, the FS concluded in its Biological Assessments that lynx habitat and viability would not be adversely affected by the sales.

Plaintiffs cite *Wilderness Society v. Thomas* to support their arguments. 188 F.3d 1130 (9th Cir.1999). In *Thomas,* the Ninth Circuit held the FS's general methodology in determining grazing suitability in a forest plan was subject to judicial review because a causal relationship existed between site-specific injuries and alleged defects in the forest plan. The court explained the Supreme Court in *Ohio·Forestry* merely held "a generic challenge to a forest plan untethered to any specific or concrete harm [is] not ripe for adjudication, and therefore not justiciable." *Id.* at 1133. Similarly, challenges that only identify affected sites without alleging a harm "causally related" to the forest plan are not justiciable. *Id.* at 1134. On the other hand, a plaintiff may challenge a programmatic decision such as a forest plan if the plaintiff alleges "either (1) imminent concrete injuries that would be caused by the forest plan, such as 'allowing motorcycles into a bird-watching area' or 'clos[ing] a specific area to off-road vehicles', or (2) a site-specific injury causally related to an alleged defect in the forest plan." *Id.*

(citing *Ohio Forestry*, 523 U.S. at 738, 118 S.Ct. 1665).

The Court finds *Thomas* is on point. The revision of the LCAS and new mapping direction have a direct causal relationship to the alleged harm caused to Plaintiffs. The FS's implementation of the specific timber sales depends on the FS's Biological Assessments, which, in turn, rely on the Revised LCAS and new mapping direction for the conclusion that the timber sales will have no adverse impact on lynx viability and critical habitat. The Court concludes, therefore, the Revised LCAS and new mapping direction are judicially ripe for review as a final agency action.

The second question is whether Defendants violated NFMA either by *de facto* amendment of or failure to act to amend the Forest Plan through implementation of the Revised LCAS and new mapping direction without public involvement.

■■■ Whether the issue is framed in terms of a failure to act or a *de facto* amendment, the relief Plaintiffs seek is the same: an order compelling Defendants to comply with the public involvement requirements of NFMA relating to forest plan amendments. Section 706 of the APA provides courts may "compel agency action unlawfully withheld or unreasonably delayed." Courts allow review under this "limited exception to the finality doctrine" only when an agency genuinely has failed to act. *Ecology Ctr., Inc. v. United States Forest Serv.*, 192 F.3d at 926. Thus, "complaints about the sufficiency of an agency action 'dressed up as an agency's failure to act'" are not reviewable. *Id.* (quoting *Nevada v. Watkins*, 939 F.2d 710, 714 n. 11 (9th Cir.1991)). Moreover, a failure to act is not reviewable unless the agency's inaction is "'in the face of clear statutory duty or is of such a magnitude that it amounts to an abdication of statutory responsibility.'" *ONRC Action v. BLM*, 150 F.3d 1132, 1137 (9th Cir.1998)(quoting *Pub. Citizen Health Research Group v. Comm'r, Food and Drug Admin.*, 740 F.2d 21, 32 (D.C.Cir.1984)).

Plaintiffs rely on *Prairie Woods Prod. v. Espy*, Civ. No. 93–6288 (J. Hogan) (D.Or., Oct. 19, 1994), in which the plaintiffs challenged the FS's decision to implement certain interim measures designed to mitigate the impact of timber sales on old-growth dependent species. The interim measures were designed to last only until the FS completed its EIS regarding its long-term strategy for these species. The court noted "NFMA vests the Forest Service with broad discretion to determine how to address new information, whether to amend established forest plans, and whether to make preliminary non-appealable planning decisions pending formal environmental review." Nonetheless, the court rejected the FS's argument that it could revise or amend forest plans to reflect new information without first adopting a formal forest plan amendment or revision. The court explained, "The difficulty with defendants' argument is that there is no discernible limit to the type of 'interim change' exempt from formal amendment and public participation procedures." Although the court stated the agency might be able to make short-term, interim changes without formal amendments in emergency situations, the court found emergency circumstances did not exist in that case. The court, therefore, enjoined the FS from applying the interim measures to remaining timber sales until it complied with NFMA's plan amendment and public participation requirements.

Plaintiffs also rely on *House v. United States Forest Serv.*, 974 F.Supp. 1022 (E.D.Ky.1997), in which the plaintiffs brought an action against the FS for declaratory and injunctive relief to prevent the FS from proceeding with a proposed

timber sale located within a one-mile radius of several cave systems where the endangered Indiana bat was known to be present. The plaintiffs argued the FS violated NFMA when it approved timber sales based on policies that were not formally merged into the forest plan for approving the timber sales. The plaintiffs argued the policies, in actuality, were amendments to the forest plan, and the FS, therefore, was required to comply with NFMA's public notice provisions. The FS contended the policies merely clarified the standards and guidelines already in the forest plan. The court, however, found the policies provided additional guidelines, and, therefore, they were subject to the notice and comment procedures set forth in NFMA and NEPA. The court, therefore, ordered the FS not to implement the policies until the forest plan had been properly amended under NFMA. *Id.* at 1034.

Here Plaintiffs argue the Revised LCAS and new mapping direction are forest-wide policies that add lynx guidelines to the Forest Plan where none originally existed. Plaintiffs, therefore, assert these documents are far more than mere clarifications. Accordingly, Plaintiffs argue these policies must be part of the "one integrated plan" for management of the Forest pursuant to NFMA, and their implementation must be preceded by a formal amendment of the Forest Plan, which requires the procedural safeguards of public involvement.

Defendants respond NFMA does not include any clear statutory duty to amend formally the Forest Plan, which would require public involvement. Defendants rely primarily on *ONRC Action v. BLM,* 150 F.3d 1132 (9th Cir.1998), to support this argument. Like *Prairie Wood Products,* *ONRC Action* involved the Eastside Management Plan for public lands and national forests east of the Cascade Range. In

*ONRC Action,* the plaintiff environmental groups asserted the BLM was not permitted to commit irretrievable resources to certain actions until it completed an EIS to amend the plan. In particular, the plaintiffs argued the BLM was neglecting its duty under FLPMA to monitor adequately and to amend its management plans before relying on those plans to make land-management decisions. The Ninth Circuit held FLPMA does not include a clear duty to update land-management plans or to cease actions during the updating process. *Id.* at 1140. Specifically, the amendment section of FLPMA provides "the Secretary shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and, when appropriate, revise land use plans." 43 U.S.C. § 1712(a). The Ninth Circuit held this language does not create a "clear duty of when to revise the plans, nor does it create a duty to cease actions during such revisions." *Id.* at 1139. In addition, the Ninth Circuit noted the plaintiffs failed to point to any provision in FLPMA or the regulations that would require BLM to cease actions during the revision process even though a thorough examination of the current plans would reveal that revision was warranted. *Id.* at 1140.

In this case, Defendants argue NFMA, like FLPMA, does not contain any provision that requires the FS to amend its current Forest Plan or to halt activities in the Forest during the revision process. Plaintiffs, on the other hand, assert this case is not analogous to *ONRC Action* because the plaintiffs' claims in *ONRC Action* are best characterized as a challenge to the BLM's decision not to change the status quo. Plaintiffs emphasize the FS in this case already has made the decision and has acted to change the Forest Plan by implementing the Revised LCAS and new mapping direction. Plaintiffs contend the FS action triggers the mandatory duty to amend the Forest Plan because the FS

may not implement changes that have not been incorporated through the required public involvement procedures of NFMA.

■ The Court concludes Plaintiffs have made the more persuasive argument. The Revised LCAS and the new mapping direction are substantial additions to the Forest Plan with regard to lynx conservation efforts as demonstrated by the fact the FS specifically relied on those documents when it prepared its Biological Assessments and concluded the projects at issue could proceed on the basis that lynx habitat was not found within those projects. Here the revision of the LCAS and the new mapping direction were not merely part of the day-to-day operations of the FS like the less substantial actions taken by the FS and BLM in the cases on which Defendants primarily rely. The court's concerns in *Prairie Woods Products* regarding the absence of discernible limits to the discretion of the FS to forego or to forestall formal amendment procedures with their concomitant public involvement also are concerns in this case. The fact the FS takes the position that it will begin the revision or amendment process for the Forest Plan relative to the lynx in 2004 for completion in 2008 suggests the FS recognizes the substantial import of its actions even though it has chosen to avoid doing now what it will have to do later; *i.e.,* involve the public in the process. Whether based on a theory of a *de facto* amendment or a failure to act to amend, therefore, the Court concludes an order compelling the public involvement required by NFMA is warranted as to these timber sales.

### 2. Counts 2 and 3—Substantive Challenges under NFMA.

Plaintiffs allege Defendants acted arbitrarily and capriciously generally in the

Forest Plan (Count 2) and specifically in their subsequent revision to the LCAS and new mapping direction (Count 3). Plaintiffs contend Defendants failed to assure diverse and viable populations of lynx across the Forest in violation of NFMA and 36 C.F.R. § 219.19(a)(7), the regulation in effect before November 2000 [3] that requires the FS to identify habitat determined to be critical for threatened species such as the lynx and to prescribe measures to prevent the destruction or adverse modification of such habitat. Defendants concede Plaintiffs may have the right to challenge the site-specific projects (Count 3) on the theory that the projects fail to maintain the viability of the lynx because either the Forest Plan has inadequate standards or the projects are inconsistent with the standards in the Forest Plan. Defendants argue, however, Plaintiffs have not presented any evidence to support their assertions that the projects harm the viability of the lynx. In other words, the FS contends its best science is to the contrary and, therefore, the FS has not acted arbitrarily and capriciously.

In response to Plaintiffs' challenge to the Forest Plan generally (Count 2), Defendants reiterate the principles in *Ohio Forestry* defeat Plaintiffs' claim. Defendants note *Ohio Forestry* distinguishes between a Forest Plan with inadequate standards (to which a challenge may be appropriate) and a Forest Plan in which no standards exist (to which a challenge is inappropriate) as in this case.

Plaintiffs agree both Counts 2 and 3 relate to the same issue: Whether the FS acted arbitrarily and capriciously when it issued Biological Assessments in 2001 concluding none of the timber sales would adversely impact the lynx or lynx habitat.

---

**3.** This regulation was amended in November 2000. The parties agree the former regula-

tion applies to the issues in this case.

Plaintiffs assert the FS must comply with the substantive requirements of NFMA that are designed to ensure continued diversity of plant and animal communities. *See* 16 U.S.C. § 1604(g)(3)(B).

Former 36 C.F.R. § 219.19 requires the FS to ensure the viability of wildlife species. "[H]abitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area." Former 36 C.F.R. § 219.19. The planning area is defined as the area covered by the forest plan; *i.e.,* the forest itself. In addition, pursuant to former 36 C.F.R. § 219.19(a)(7), when a species is designated as threatened or endangered under the ESA, the following additional requirements apply:

Habitat determined to be critical for threatened and endangered species shall be identified, and measures shall be prescribed to prevent the destruction or adverse modification of such habitat. Objectives shall be determined for threatened and endangered species that shall provide for, where possible, their removal from listing as threatened and endangered species through appropriate conservation measures, including the designation of special areas to meet the protection and management needs of such species.

Plaintiffs emphasize the existing Forest Plan is silent as to how the lynx or lynx habitat will be protected and does not include any standards or guidelines to ensure their viability. Plaintiffs contend, therefore, the FS's approval of the site-specific timber sales at issue is not in accordance with law because the Forest Plan fails to ensure the survival of viable populations of lynx. As noted, Plaintiffs' claims constitute a programmatic challenge to the Forest Plan (Count 2) and to the specific timber sales (Count 3) that

have been implemented in accordance with the Forest Plan and the subsequent Revised LCAS and new mapping direction.

The parties disagree on the scope of the viability requirement. Defendants argue the viability regulation only requires the FS to show that each site-specific project will maintain viability. Defendants contend they designed all of these projects to ensure the viability of the lynx using the best scientific information available (the Revised LCAS and the new mapping direction) concerning the lynx and lynx habitat. In addition, Defendants argue Plaintiffs do not present any credible evidence to support their allegations that the Forest Plan and the site-specific projects fail to maintain the viability of the lynx. In any event, Defendants point out the Court must defer to the agency's interpretation of equivocal evidence as long as that interpretation is reasonable. Thus, Defendants assert the FS's determination that it has maintained the viability of the lynx in the timber sales through the Revised LCAS and new mapping direction is not arbitrary and capricious as a matter of law.

Plaintiffs emphasize the viability regulation applies at both forest-wide and site-specific levels. In addition, Plaintiffs argue the FS could not ensure the forest-wide viability of the lynx merely by considering each site-specific project.

In *Idaho Sporting Congress v. Rittenhouse,* the Ninth Circuit recently upheld a substantive challenge under NFMA to two timber sales in the Boise National Forest on the ground that the viability standard in the overall forest plan (to which the two sales were tiered) was invalid. 305 F.3d 957 (9th Cir.2002). The court, however, refused to issue a forest-wide injunction against all logging and stated "[s]uch a sweeping remedy is not warranted. At such time as the Forest Service seeks to approve future logging projects, it must

demonstrate compliance with the Forest Act and NEPA for those sales." *Id.* at 974.

Plaintiffs argue the holding in *Idaho Sporting Congress v. Rittenhouse* applies particularly to this case because no lynx viability standards are included in the Forest Plan. Defendants, however, distinguish this case from Idaho Sporting Congress v. Rittenhouse, which involved a forest plan with viability standards that were inadequate. Although the Forest Plan at issue here does not contain standards specific to the lynx, Defendants point out the FS engaged in scientific studies regarding lynx habitat that resulted in the Revised LCAS and new mapping direction, which, in turn, set forth standards to meet the viability requirements of the regulations. The FS expressly relied on the Revised LCAS and new mapping direction standards when it prepared Biological Assessments and concluded none of the timber sales at issue adversely impacted the lynx and lynx habitat.

■ In deference to an agency's expertise, the district court reviews an agency's interpretation of its own regulations solely to determine whether that interpretation is arbitrary and capricious. 5 U.S.C. § 706(2)(A). Thus, the court will uphold an agency's interpretation unless it is plainly erroneous or inconsistent with the regulation to the extent that it results in a clear error of judgment. *Hells Canyon Alliance v. United States Forest Serv.,* 227 F.3d at 1177. Here Plaintiffs challenge the lynx viability standards set forth in the Revised LCAS and the new mapping direction on procedural grounds under NFMA and NEPA. If that challenge is successful, the FS's reliance on the standards in the Revised LCAS and new mapping direction constituted a clear error of judgment and, therefore, was arbitrary and capricious.

As noted, the Court has found the Revised LCAS and new mapping direction are procedurally flawed under NFMA because of the lack of public involvement. For the additional reasons that follow, the Court also finds the Revised LCAS and new mapping direction are procedurally flawed under NEPA. Defendants' determination of viability based on these procedurally-flawed agency actions, therefore, was not reasonable. Accordingly, the Court concludes Plaintiffs' substantive challenge against the specific timber sales in Count 3 is well-taken. Consistent with the principles in *Idaho Sporting Congress v. Rittenhouse,* however, the Court will enjoin only the specific timber sales at issue rather than all activities within the Forest pending compliance with the applicable procedural requirements.

## C. *Second Claim: Violation of NEPA.*

NEPA has two purposes: (1) to impose on a federal agency "the obligation to consider every significant aspect of the environmental impact of a proposed action" and (2) to ensure "the agency will inform the public that it has indeed considered environmental concerns in its decision making process." *Kern v. United States Bureau of Land Mgmt.,* 284 F.3d 1062, 1066 (9th Cir.2002) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)). NEPA does not contain substantive environmental standards but instead "establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences." *Id.* (quoting *Metcalf v. Daley,* 214 F.3d 1135, 1141 (9th Cir.2000)).

NEPA requires federal agencies to prepare an EIS before taking "major Federal actions significantly affecting the quality of the environment." 42 U.S.C. § 4332(2)(C). The first step in the environmental review

process is to determine whether the proposed action is categorically exempt from environmental review. If an action is not categorically exempt, federal regulations permit the agency to conduct a less exhaustive Environmental Assessment to determine whether the proposed action "may significantly affect" the environment and, therefore, whether the agency is required to prepare an EIS. *Native Ecosystems Council v. Michael*, 304 F.3d 886 (9th Cir. 2002). *See also* 40 C.F.R. §§ 1501.4(b), 1508.9.

■ To prevail on a claim that the agency violated its statutory duty to prepare an EIS, a "plaintiff need not show that significant effects will in fact occur." *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir.1998). The plaintiff only has to raise substantial questions as to whether a project may have a significant effect on the environment. *Id.* An Environmental Assessment is a "concise public document" that "briefly provide[s] sufficient evidence and analysis for determining whether the impact is significant enough to require the preparation of an EIS or whether a Finding of No Significant Impact (FONSI) may be issued instead." 40 C.F.R. § 1508.9. An Environmental Assessment must contain brief discussions of (1) the need for the proposed action, (2) alternatives to the proposal, (3) the potential environmental impacts of the proposal and alternatives, and (4) a listing of agencies and persons· consulted during the assessment. 40 C.F.R. § 1508.9. A FONSI must present briefly the reasons an action will not have a significant effect on the human environment. 40 C.F.R. § 1508.13.

### 1. *Count 1—Failure to Prepare an Environmental Assessment or EIS for the New Mapping Direction.*

Plaintiffs contend the FS should have prepared an Environmental Assessment or an EIS pursuant to NEPA because the new mapping direction eliminated thousands of acres of previously-recognized lynx habitat and, as a result, decreased protection for the lynx. According to Plaintiffs, therefore, the new mapping direction constitutes a major federal action that will significantly affect the quality of the human environment.

Defendants argue the new mapping direction is not a final agency action because mapping alone does not significantly impact the environment, and Plaintiffs, therefore, cannot show the new mapping direction results in any harm. In addition, Defendants assert the new mapping direction is categorically excluded by the Secretary of Agriculture, and, therefore, the mapping was not arbitrary and capricious.

The threshold issue is whether the new mapping direction is a final agency action. The Court concludes the new mapping direction is a final agency action for the reasons stated in the analysis of Plaintiffs' claims brought under NFMA.

The second issue is whether the new mapping direction is a major federal action that will significantly affect the environment. The Council on Environmental Quality (CEQ) has promulgated regulations in which it specifies major federal actions include new or revised agency policies such as those that "guide or prescribe alternative uses of Federal resources, upon which future actions will be based." 40 C.F.R. § 1508.18. CEQ regulations establish three categories of agency action for NEPA purposes: (1) proposals for major federal actions that usually require an EIS should immediately trigger preparation of an EIS, *see* 40 C.F.R. § 1501(4)(a); (2) the agency may designate types of actions that usually do not require the preparation of an EIS to be "categorically excluded," which will preclude NEPA review absent

extraordinary circumstances, *see* 40 C.F.R. § 1508.4; and (3) any action that does not fall within the first or second category should be evaluated in an Environmental Assessment to determine whether the impact may be significant and, as a result, require the preparation of an EIS, *see* 40 C.F.R. § 1501.4(b). *See also Siskiyou Reg'l Educ. Project v. Rose*, 87 F.Supp.2d 1074 (D.Or.1999).

Plaintiffs repeat their argument that the new mapping direction is a major federal action that significantly affects the lynx because it effectively removes thousands of acres of Forest as lynx habitat.

Defendants, however, argue the new mapping direction is not a major federal action, but merely part of the day-to-day management activities of the FS in gathering inventory information. "The gathering of inventory data has no effect on the environment. Preparing maps from habitat descriptions can hardly be said to affect the human environment." Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J. at 24.

Moreover, Defendants assert the new mapping direction has been categorically excluded by the Secretary of Agriculture in his regulation for "[i]nventories, research activities, and studies, such as resource inventories and routine data collection when such actions are clearly limited in context and intensity." 57 Fed.Reg. 43180, 43208 (Sept. 18, 1992). Defendants maintain their interpretation of new mapping direction as an action included within the above categorical exclusion "should be given controlling weight unless plainly erroneous or inconsistent with the terms of the regulation." *See Alaska Ctr. for the Env't v. United States Forest Serv.*, 189 F.3d 851, 857 (9th Cir.1999).

After considering the arguments of the parties, the Court concludes Defendants have substantially minimized the effects of the new mapping direction. The new mapping direction was far more than the result of day-to-day inventory-taking. It significantly changed the nature and the extent of lynx habitat, and the consequences to the lynx may be far-reaching. It has been used by the FS to reduce the recognized primary lynx habitat within the Forest by thousands of acres and enabled the FS in its Biological Assessments for the timber sales to conclude the sales would not occur within primary lynx habitat and, therefore, would not impact the lynx adversely. The Court finds Defendants, at the least, were required under NEPA to prepare an Environmental Assessment with public involvement to determine whether the new mapping direction might significantly affect the lynx in the Forest and whether Defendants should prepare an EIS.

### 2. Count 2—Supplemental EIS (SEIS) for 1990 Forest Plan.

Plaintiffs also contend the fact the FS eventually made substantial changes regarding the management of the lynx and the identification of lynx habitat in the Forest indicates the FS should have prepared a SEIS for the original 1990 Forest Plan pursuant to NEPA. In addition, Plaintiffs assert Defendants violated NEPA by tiering the Biological Assessments on the site-specific projects to the Revised LCAS and new mapping direction even though those documents were not subjected to NEPA review. Finally, Plaintiffs argue Defendants acted arbitrarily and capriciously when they failed to supplement the 1990 EIS for the original Forest Plan based on new information regarding the lynx, including the various scientific studies done by the FS on the lynx and its habitat, the listing of the lynx as threatened under the ESA in 2000, the revision of the LCAS, and the new mapping direction. Plaintiffs contend the fact that several other forests in the Rocky

Mountain region have decided to supplement their EISs based on the same new information supports Plaintiffs' argument that Defendants' failure to act has been arbitrary and capricious.

Defendants, in turn, assert the FS has determined it will revise or amend the Forest Plan to include specific direction for lynx management in the future. Defendants contend, however, the new lynx information on which the Revised LCAS and new mapping direction were based is not significant enough to require a SEIS now. Defendants maintain they have acted appropriately on the new information by, *inter alia,* entering into a Conservation Agreement with other agencies. Defendants insist, however, they are not required to supplement the original Forest Plan EIS. Defendants also argue the listing of a species as threatened under the ESA is not significant by itself. *See Swanson v. United States Forest Serv.,* 87 F.3d 339, 344 (9th Cir.1996) (court held the new listing of salmon as threatened did not require a SEIS, particularly when the FS previously determined the proposed timber sales would not adversely impact the salmon). Defendants also point to *Idaho Sporting Cong. v. United States Forest Serv.* in which the court held recent wildfires did not require a SEIS for the forest plan when the FS issued a report stating immediate changes to the forest plan were not required. 31 F.Supp.2d 1236 (D.Idaho 1996), *aff'd,* 122 F.3d 1071 (9th Cir.1997). In summary, Defendants state they are not engaging in any activities that, in their judgment, would adversely affect the lynx. Of course, Defendants' judgment is based on the information contained in the new mapping direction, which eliminated substantial acreage in the Forest as lynx habitat.

In *Idaho Sporting Cong. v. Alexander,* the court stated "NEPA imposes on federal agencies a continuing duty to supplement existing EAs and EISs in response to 'significant new circumstances or information relevant to environmental concerns and bearing on the proposed action and its impacts.'" 222 F.3d 562, 566 n. 2 (9th Cir.2000) (citing 40 C.F.R. § 1509(c)(1)(ii)). In *Friends of the Clearwater v. Dombeck,* the court further stated "[w]hen new information comes to light, the agency must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require [a SEIS]." 222 F.3d 552, 558 (9th Cir.2000) (citing *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)).

 When reviewing a decision not to prepare a SEIS, the court considers four factors: (1) the environmental significance of the new information, (2) the probable accuracy of the information, (3) the degree of care with which the agency considered the information and evaluated its impact, and (4) the extent to which the agency supported its decision not to supplement the EIS with a statement of explanation or additional data. *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1438 (9th Cir. 1988).

In *Friends of the Clearwater,* the new information included the designation of seven previously unlisted species as "sensitive" together with the FS's acknowledgment that the original forest plan's standards for old growth and snags were inadequate. 222 F.3d at 555–56. The court found the FS "should have timely and properly considered the need for an SEIS in light of the new information that the Forest Service itself had developed concerning sensitive species and its old growth and snag standards." The court held the FS's failure to do so violated NEPA. *Id.* at 561.

 This Court agrees with Plaintiffs that Defendants do not offer a satisfactory

explanation as to why the new mapping direction is not sufficiently significant for Defendants now to supplement the original EIS for this Forest when other forests have decided to do so. The Court also finds it unreasonable for Defendants to suggest their agreement to defer activities likely to affect the lynx adversely is adequate in light of the fact Defendants' new mapping direction was prepared without any public involvement and formed the basis for Defendants' determination that none of the current activities would involve primary lynx habitat or adversely impact the lynx.

■ Finally, Plaintiffs argue the Biological Assessments conducted by the FS for the timber sales at issue relied on the Revised LCAS and new mapping direction even though these documents did not undergo NEPA analysis. Plaintiffs cite *Kern v. United States Bureau of Land Mgmt.* for the proposition that "tiering to a document that has not been prepared pursuant to NEPA is not permitted, for it circumvents the purpose of NEPA." 284 F.3d 1062, 1073 (9th Cir.2002).

Defendants reiterate their position that neither the Revised LCAS nor the new mapping direction constitute final agency action or a major federal action sufficient to trigger NEPA analysis and, accordingly, Defendants did not improperly tier to the Biological Assessments for the timber sales.

Because Defendants did not comply with NEPA when they implemented the new mapping direction, the Court concludes it was improper for Defendants to tier the Biological Assessments for the timber sales to the new mapping direction.

### D. *Third Claim: ESA.*

Plaintiffs contend Defendants violated § 7 of the ESA, 16 U.S.C. § 1531, *et seq.*, by failing to consult on the Sandy Bottle Project, the Lone Dog Project, and part of the McCully Projects. Plaintiffs, however, concede the Court's rulings on their claims under NFMA and NEPA render their ESA claim moot.

### CONCLUSION

For these reasons, the Court **GRANTS IN PART** Plaintiffs' Motion for Summary Judgment and Injunctive Relief as to their First Claim brought under NFMA and their Second Claim brought under NEPA to the extent those claims constitute specific challenges to the following pending timber sales: the McCully Restoration Projects, the Sandy Bottle Restoration Project, and the Little Bear Project. Accordingly, the Court hereby enjoins Defendants from all activities in furtherance of these timber sales pending compliance with the procedural requirements of NFMA and NEPA. The Court's resolution of Plaintiffs' Motion with regard to these three timber sales renders moot Plaintiffs' Third Claim brought under the ESA. The Court otherwise **DENIES** Plaintiffs' Motion for Summary Judgment and specifically denies Plaintiffs' request for injunctive relief on a broad, programmatic basis against the Wallowa–Whitman Land and Resource Management Plan.

The Court also **GRANTS IN PART** Defendants' Cross–Motion for Summary Judgment based on the Court's lack of subject-matter jurisdiction to consider the Lone Dog Project. The Court **DENIES** Defendants' Cross–Motion in all other respects.

IT IS SO ORDERED.