188 F.3d 1130 (9th Cir. 1999)
 WILDERNESS SOCIETY, a non-profit corporation; SIERRA CLUB, a non-profit corporation, Plaintiffs-Appellants,
v.
JACK WARD THOMAS, Chief of the United States Forest Service; CHIP CARTWRIGHT, Regional Forester for the Southwest Region of the Forest Service; MICHAEL KING, Forest Supervisor for the Prescott National Forest, Defendants-Appellees,
YAVAPAI CATTLE GROWERS ASSOCIATION, a non-profit association; REX G. MAUGHAN; RUTH G. MAUGHAN; HOBSON FAMILY TRUST, Defendants-Intervenors-Appellees.
 No. 98-16693
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted July 13, 1999--San Francisco, California
Decided August 24, 1999
 
 [Copyrighted Material Omitted]
 Deborah S. Reames, Earthjustice Legal Defense Fund, San Francisco, California, Gilbert T. Venable, Barton, Venabale, Gullette & Randall, Phoenix, Arizona, for the plaintiffs- appellants.
 
 
 1
 Lisa E. Jones, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for the defendants-appellees.
 
 
 2
 Karen Budd-Falen, L. Eric Lundgren, Budd-Fallen Law Offices, Cheyenne, Wyoming, for the defendants-intervenors-appellees.
 
 
 3
 Appeal from the United States District Court for the District of Arizona; Paul G. Rosenblatt, District Judge, Presiding. D.C. No. CV-96-01812-PGE.
 
 
 4
 Before: Herbert Y. C. Choy, Ferdinand F. Fernandez andSidney R. Thomas, Circuit Judges.
 
 THOMAS, Circuit Judge:
 
 5
 In this appeal, we consider whether the United States Forest Service ("Forest Service") violated the National Forest Management Act ("NFMA" or "the Act"), 16 U.S.C. S 1600, et seq., in preparing a Forest Plan for the Prescott National Forest. We conclude that the Forest Service complied with the Act, and affirm the judgment of the district court.
 
 
 6
 * The Prescott National Forest ("Forest") is a unit of the National Forest System located in a relatively mountainous area in central Arizona, about 70 air miles north of Phoenix. Following its creation in 1908, the original Forest area was supplemented by additional land over the years, and it now contains approximately 1,227,000 acres. The Forest Service manages the Forest for a variety of uses, including camping, backpacking and horseback riding. It has historically also been used for livestock grazing, managed through the issuance of grazing permits to ranchers on a total of 69 separate grazing allotments.
 
 
 7
 The NFMA requires the Forest Service to develop and maintain a forest management plan for each unit of the National Forest System. See 16 U.S.C. S 1604 (a). The forest plans must provide for multiple uses of forests, including "coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C.S 1604(e)(1). All permits and contracts for the use of the forests must be consistent with the forest plans. See 16 U.S.C.S 1604(i).
 
 
 8
 In November 1985, the Forest Service issued a Proposed National Forest Plan for the Forest in central Arizona, together with a Draft Environmental Impact Statement. After a period of public comment and review, the final Plan and accompanying Environment Impact Statement ("EIS") were issued. The Regional Forester approved the Plan in a Record of Decision ("ROD").
 
 
 9
 The Plan identified aggregate acreage not "capable" of being used for commercial livestock grazing due to physical constraints such as steepness of slopes and lack of soil. A coalition of environmental groups, including the plaintiffs, administratively appealed the ROD, claiming that the Forest Service was obligated by its own regulations to conduct a separate grazing suitability analysis in order to physically identify land "suitable" for livestock grazing.
 
 
 10
 The Forest Service affirmed the Regional Forester's decision to adopt the Plan, concluding that it conformed to applicable regulations. Thereafter, the plaintiffs filed suit in district court, alleging that the NFMA requires the Forest Service to determine whether lands deemed "capable" of supporting livestock grazing are also "suitable" for livestock grazing, based on a consideration of the economic and environmental consequences of grazing and the alternative uses foregone. Additionally, plaintiffs alleged that since the adoption of the Plan, the Forest Service has approved numerous site-specific allotment management plans and issued grazing permits without conducting an analysis of "grazing suitability."
 
 
 11
 The complaint stated four claims for relief: (1) that the Forest Service violated the NFMA by adopting the Plan before conducting a grazing suitability determination; (2) that the Forest Service violated the NFMA by issuing grazing permits for the Crooks Canyon/Maverick grazing allotment without first conducting a grazing suitability determination; (3) that the Forest Service violated the NFMA by issuing grazing permits for the Brady Butte grazing allotment without first conducting a grazing suitability determination; and (4) that the Forest Service violated the Administrative Procedures Act ("APA") by arbitrarily and capriciously permitting grazing in the Prescott National Forest in the absence of a suitability determination.
 
 
 12
 The district court granted summary judgment in favor of the Forest Service and defendants-intervenors Yavapai Cattle Growers, and this appeal followed.
 
 II
 
 13
 We address first the question of whether this case is justiciable pursuant to Ohio Forestry Ass'n, Inc. v. Sierra Club, 118 S. Ct. 1665 (1998). Ohio Forestry held that a generic challenge to a forest plan untethered to any specific or concrete harm was not ripe for adjudication, and therefore not justiciable. The Court enumerated three factors in deciding whether the agency decision to adopt the forest plan was ripe for judicial review: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." Id at 1670.
 
 
 14
 Applying those criteria to a challenge to a forest plan's specification for logging and clear-cutting, the Court noted that the forest plan at issue did not by itself bestow or diminish legal rights because any logging activity requires a sitespecific action preceded by a permitting process. See id. As a consequence, the challenge to the forest plan was not ripe for judicial review. See id. However, the Court further noted that the ripeness doctrine does not always render forest plans immune to challenge because a later challenge to a sitespecific action, brought "when harm is more imminent and more certain[,] . . . might also include a challenge to the lawfulness of the present Plan if . . . the Plan plays a causal role with respect to the . . . then-imminent[ ] harm from logging." Id. The Court indicated that the ripeness doctrine would not bar a challenge to a forest plan if the plaintiff alleged a specific harm that would flow immediately from adoption of the plan. See id. -, 118 S.Ct. at 1672-73.[1]
 
 
 15
 Ohio Forestry embraces the eminently sensible proposition that harm is best assessed when it is tangible, rather than theoretical. Thus, for a challenge to a forest plan to be justiciable under the Act, the plaintiffs must allege either (1) imminent concrete injuries that would be caused by the forest plan, such as "allowing motorcycles into a bird-watching area" or "clos[ing] a specific area to off-road vehicles," see 523 U.S. at-, 118 S. Ct. at 1673, or (2) a site-specific injury causally related to an alleged defect in the forest plan. Generic challenges to the sufficiency of forest plans are no longer justiciable, nor are challenges that merely identify affected sites without alleging a harm causally related to the forest plan. See id.; see also ONRC Action v. BLM, 150 F.3d 1132, 1136 (9th Cir. 1998) (acknowledging that Ohio Forestry "calls into doubt a plaintiff's ability to challenge an agency's adoption of a plan without site-specific actions as the focus of the challenge").
 
 
 16
 Here, plaintiffs' complaint alleges not only that the Forest Service violated the NFMA by failing to conduct a forestwide grazing suitability study, but also that the Forest Service violated the NFMA at a site-specific level by approving allotment management plans for the Crooks Canyon/Maverick and the Brady Butte allotments without identifying the lands suitable for grazing on those allotments. In short, the plaintiffs allege that the Forest Service's general methodology in determining grazing suitability in the Forest Plan was flawed, causing site-specific harm by allowing grazing in an area unsuitable for it. Thus, the claims alleged in count one (a general challenge to the Forest Plan) are not justiciable; however, the claims alleged in counts two and three (site specific injury relating to Crooks Canyon/Maverick and the Brady Butte allotments) are ripe for review. Because the site-specific injury to the two allotments is alleged to have been caused by a defect in the Forest Plan, we may consider whether the Forest Service complied with the Act in making its general grazing suitability determinations in the Forest Plan.
 
 
 17
 In sum, the Ohio Forestry ripeness factors do not weigh against judicial review of counts two and three at this juncture. An actual, site-specific injury causally related to a plan defect has been alleged. The question presented by the plaintiffs -- whether the Forest Service is obliged under the NFMA to conduct a distinct grazing suitability analysis -- is essentially a question of law. Therefore, the court would not benefit from further factual development of the issue presented. Because the action seeks to compel the agency to comply with an alleged NFMA requirement, judicial intervention would not interfere inappropriately with further administrative action. Finally, our review does invoke "the kind of `abstract disagreements over administrative policies' that the ripeness doctrine seeks to avoid." Ohio Forestry, 118 S. Ct. at 1672 (quoting Abbott Labs. v. Gardner 387 U.S. 136, 148 (1967)). However, count one of plaintiffs' complaint presents a generic challenge which Ohio Forestry cautions against adjudicating. Thus, counts two and three of plaintiffs' complaint are ripe for adjudication; count one is not.
 
 III
 
 18
 The Plan EIS stated that 273,000 acres of the Forest were not suitable for livestock grazing because of steep slopes, unstable soils, rock outcrops, and dense timber. The Plan designates the remaining 977,834 acres of the forest as suitable for livestock grazing. Plaintiffs argue that the Plan shows an identity of acreage between land designated as "capable" and land designated as "suitable" as a result of a blanket decision to designate as suitable all lands capable of grazing, without taking into account the economic or environmental consequences of livestock grazing or its effects on alternative uses of those lands as required by Forest Service regulations.[2]
 
 
 19
 The applicable regulations mandate that the "suitability and potential capability of National Forest System lands for producing forage for grazing animals and for providing habitat for management indicator species shall be determined" in the forest planning process. 36 C.F.R. S 219.20. To this end, the Forest Service must identify lands suitable for grazing and browsing, id., where suitability is "[t]he appropriateness of applying certain resource management practices to a particu- lar area of land, as determined by an analysis of the economic and environmental consequences and the alternative uses foregone," id. S 219.3.
 
 
 20
 * The Forest Service analyzed economic and environmental consequences, and considered alternative uses foregone, associated with different grazing suitability levels at the EIS stage of the forest planning process. The EIS examined seven Plan alternatives, each with different management goals and directives with respect to soil and water, recreation, wildlife and fish, range, and timber and fuelwood. Given this, the Forest Service asserts that the grazing suitability determination was conducted within a planning process that focused not on one resource at a time but, instead, upon alternatives within which different resources and management practices were proposed.
 
 
 21
 After reviewing the record, we conclude that through its analysis of the alternatives considered in the EIS, the Forest Service adequately considered both economic and environmental consequences, as well as opportunities foregone, for the preferred Plan. Where review involves the interpretation of an agency regulation, we defer "to the agency's interpretation unless it is plainly erroneous or inconsistent with the regulation." Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1356 (9th Cir. 1994) (citing Marathon Oil v. United States, 807 F.2d 759, 765 (9th Cir. 1986)). Here, it cannot be said that the agency's approach to determining grazing suitability within the consideration of alternatives in the EIS is plainly inconsistent with or contrary to the dictates of the regulation. Although the Forest Service unnecessarily complicated the analysis by occasionally interchanging the terms "suitability" and "capability," it did not violate the Act or its implementing regulations.
 
 B
 
 22
 Plaintiffs also contend that the Forest Service's consideration of alternatives does not satisfy NFMA's requirement for a determination of grazing suitability because the grazing outcomes were predetermined by the Forest Service's FORPLAN computer program. This argument misapprehends the program. At least at this stage of its development, FORPLAN is not an artificial life form. It is, purely and simply, an analytic modeling tool. It provides, among other things, an analysis of the economic consequences of various planning assumptions. Plaintiffs complain that some of these assumptions included grazing. However, examination of alternatives is precisely what is required of the Forest Service. To be sure, the FORPLAN analysis of the EIS preferred alternative did include a grazing assumption. However, other examined options did not. One alternative contained no grazing restraints while the other alternatives constrained grazing to a floor ranging from 86 to 177.5 animal unit months.
 
 
 23
 The very object of the analytic exercise is to examine the effects of alternatives; the Forest Service did not err by including grazing among them. Indeed, the Forest Service is plainly entitled to identify "parameters and criteria[ ] related to Plan standards" in generating alternatives for final consideration in the EIS. Idaho Conservation League v. Mumma, 956 F.2d 1508, 1522 (9th Cir. 1992) (accepting, for purposes of a challenge to a forest plan under the National Environmental Policy Act, that the Forest Service had properly eliminated an alternative containing more wilderness area because FORPLAN had been programmed only to generate alternatives which satisfied a given timber yield in the first decade of the plan). The Forest Service does not violate the Act by employing FORPLAN to assist in the analysis. See Nevada Land Action Ass'n v. US Forest Service, 8 F.3d 713, 717 (9th Cir. 1993).
 
 IV
 
 24
 Last, we consider plaintiffs' claim under the Administrative Procedures Act ("APA"). Under the APA, an agency decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. S 706(2)(A); Anaheim Mem'l Hosp. v. Shalala, 130 F.3d 845, 849 (9th Cir. 1997). Here, plaintiffs argue that the record contains no rational basis or explanation for the Forest Service's grazing suitability determination.
 
 
 25
 Although plaintiffs identify this as a separate claim, it is subsumed into our resolution of the NFMA claim. Having determined that the Forest Service complied with the NFMA in adopting the Plan, including the grazing suitability determination therein, plaintiffs' APA claim fails.
 
 V
 
 26
 The Forest Service is charged with managing the National Forest System for multiple uses, including livestock grazing. The preferred Plan reflects a balancing of those interests. Reasonable minds may differ in selecting the best alternative. However, the agency's assessment is not one we will judicially disturb, absent a violation of statute or regulation. In this case, the Forest Service complied with the NFMA in adopting the Plan, including the Plan's allocation of acreage suitable for grazing.
 
 
 27
 We dismiss the appeal as to count one of plaintiffs' complaint as non-justiciable. We affirm in all other respects the judgment of the district court.
 
 
 28
 DISMISSED IN PART; AFFIRMED IN PART.
 
 
 
 Notes:
 
 
 [1]
 The Ohio Forestry court also acknowledged that a forest plan could always be challenged under the National Environmental Protection Act ("NEPA") because "NEPA, unlike the NFMA, simply guarantees a particular procedure, not a particular result." 118 S. Ct. at 1672. Thus, "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." Id. There is no NEPA claim in this case.
 
 
 [2]
 The applicable regulation governing livestock grazing provides that:
 In forest planning, the suitability and potential capability of National Forest System lands for producing forage for grazing animals and for providing habitat for management indicator spe cies shall be determined as provided in paragraphs (a) and (b) of this section. Lands so identified shall be managed in accordance with direction established in forest plans.
 (a) Lands suitable for grazing and browsing shall be identified and their condition and trend shall be determined. The present and potential supply of forage for livestock, wild and free roaming horses and burros, and the capability of these lands to produce suitable food and cover for selected wildlife species shall be estimated. The use of forage by grazing and browsing animals will be estimated. Lands in less than satisfactory condition shall be identified and appropriate action planned for their restoration.
 36 C.F.R. S 219.20.
 The regulations define "capability" as:
 The potential of an area of land to produce resources, supply goods and services, and allow resource uses under an assumed set of management practices and at a given level of management intensity. Capability depends upon current conditions and site conditions such as climate, slope, landform, soils, and geology, as well as the application of management practices, such as silvi culture or protection from fire, insects, and disease.
 36 C.F.R. S 219.3
 "Suitability" is defined as:
 The appropriateness of applying certain resource management practices to a particular area of land, as determined by an analysis of the economic and environmental consequences and the alterna tive uses foregone. A unit of land may be suitable for a variety of individual or combined management practices.
 Id.