SIERRA CLUB, et al., Plaintiffs,

v.

Steven T. EUBANKS, et al., Defendants.

Earth Island Institute, et al., Plaintiffs,

v.

Department of Agriculture, et al., Defendants.

Nos. CIV. S 03–1238 MCE PAN, CIV. S 03–1242 MCE PAN.

United States District Court, E.D. California.

Aug. 27, 2004.

Patrick Gallagher, Kristin A. Henry, Sierra Club, Emily L. Kennedy, Paul, Hastings, Janofsky and Walker, San Francisco, CA, Amy Minteer, Jan Chatten–Brown, Chatten, Brown and Associates, Santa Monica, CA, Eric E. Huber, Pro Hac Vice, Sierra Club, Boulder, CO, Aaron S. Isherwood, Sierra Club, San Francisco, CA, Rachel Marie Fazio, Rachel M. Fazio, Attorney at Law, John Muir Project, Cedar Ridge, CA, for plaintiffs.

Charles M. O'Connor, United States Attorney, Assistant United States Attorney, San Francisco, CA, for defendants.

David H. Dun, Shelley C. Addison, Dun and Martinek, Eureka, CA, for intervenor-defendant.

Gary G. Stevens, Ruth G. Tiger, Saltman and Stevens, Washington, DC, Andrew Franklin Brimmer, Stoel Rives LLP, San Francisco, CA, for amicus.

## AMENDED MEMORANDUM AND ORDER

ENGLAND, District Judge.

In this consolidated case, Plaintiffs Sierra Club, Sierra Nevada Forest Protection Campaign, and Sierra Foothills Audubon Society (collectively referred to as "Sierra Club"), along with Plaintiffs Earth Island Institute, Center for Biological Diversity, Forest Issues Group and James Woods ("Earth Island"),[1] seek to enjoin Defendants United States Department of Agriculture, Ann Veneman, the United States Forest Service, Dale Bosworth, and Steven T. Eubanks ("Defendants") from taking further action to implement Defendants' Red Star Restoration Project (hereinafter referred to as the ."Red Star Project") on grounds that said project violates the Sierra Nevada Forest Plan Amendment (the "Framework"), the Tahoe Forest Land and Resource Management Plan ("Forest Plan"), the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600, et seq., the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, et seq., and the Roadless Area Conservation Rule, 36 C.F.R. § 294.10 et seq. ("Roadless Rule"). In accordance with the provisions of the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, et seq., Plaintiffs seek injunctive relief on grounds that the harm occasioned by continued implementation of the project, which involves the logging and commercial sale of timber within the Tahoe National Forest in the wake of a devastating 2001 wildfire, will be immediate and irreparable. For the reasons set forth below, the Court grants the requested preliminary injunction.[2]

## BACKGROUND

In August and September of 2001, substantial portions of the El Dorado and Tahoe National Forests burned at varying levels of intensity as a result of a wildfire, which apparently ignited in piles of "slash" (unmerchantable limbs, twigs, tops and needles from felled trees) left on the ground following logging operations in nearby private timber stands. This fire, designated by the Forest Service as the "Star Fire", burned some 10,473 acres of the Tahoe National Forest alone, including

---

1. Because both the Sierra Club and Earth Island Plaintiffs offer similar arguments in favor of a preliminary injunction in this case, they will be collectively referred to as "Plaintiffs" in this Memorandum and Order unless otherwise noted.

2. This Amended Memorandum and Order supersedes the Memorandum and Order filed August 20, 2004 in this matter. The minor modifications contained in this amended version do not change the substance of the Court's original order.

approximately 4,309 acres within the Duncan Canyon Inventoried Roadless Area. The majority of the burned acreage was designated as Old Forest Emphasis Area.

After the fire, Defendants proposed logging in burned areas within the Tahoe National Forest. To that end, a Final Environmental Impact Statement ("FEIS") for the Red Star Project was issued by the Forest Service on November 15, 2002. The primary stated purpose for the project was to reduce the risk of future severe fire in order to recover old forest conditions and retain existing old growth forest characteristics. This was to be accomplished by reducing flammable surface fuel loading in the project area. (FEIS, pp. 23–25).[3]

The alternative chosen by the FEIS in meeting these objectives permitted removal of most larger fire-killed trees, except for between four and eleven dead "snags" per acre. (*Id.* at 57). Proposed logging to remove the larger trees would generate, according to the Forest Service's own estimate, some eighty-five tons per acre of slash debris, as compared to ten tons per acre of estimated on-the-ground fuels prior to commencement of logging activities. (*Id.* at 57, 81). The Red Star Project targeted fire-killed trees (and trees predicted to succumb in the aftermath of the fire) with a diameter of 10 inches or above on an area of approximately 5,530 acres.[4] With the exception of specified logging units known as SPLATs (Strategically Placed Logging Area Treatments), where slash cleanup was planned within two to

five years if funding for such activities was available, the slash left by logging activities would not be treated or removed.[5]

Significantly, Forest Service studies relied upon in the FEIS conclude that "extreme" fire hazard is reached when surface fuels exceed thirty to forty tons per acre.[6] In justifying removal of larger trees for commercial sale, however, Defendants contend that reduction of overall fuel volume by logging such trees decreases overall fire risk. They point to the fact that failing to take any action to reduce fuel volumes will result in a remaining average of 160 tons of fuel per acre, while the proposed logging would reduce that tonnage to some 85 tons, albeit of smaller diameter woody material that Plaintiffs contend is far more combustible. According to Plaintiffs, the larger diameter logs, if ignited, will cause a more intense fire that is more likely to destroy regenerating forest and soil conditions. Defendants further contend that leaving slash on the forest floor as ground cover will also benefit and protect soil resources by preventing erosion and retaining crucial soil nutrients.

In bringing the present actions, Plaintiffs contend that the Red Star Project contravenes both the Forest Plan, the Framework and the Roadless Rule. They argue that the provisions of both the NFMA and NEPA are consequently violated, and seek relief under the provisions of the APA. Except for a modification of the Red Star Plan with respect to the Duncan Canyon Inventoried Roadless Area (which required that certain planting

---

**3.** The body of the FEIS in this case is contained within the Administrative Record at 2:1128–3:1530. The appendices to the FEIS follow.

**4.** To date, only logging of trees with no green canopy remaining has been effected.

**5.** With respect to the Duncan Canyon Inventoried Roadless Area, about three-quarters of

the area proposed for logging is outside the designated SPLATs.

**6.** *See* James K. Brown, et al., *Coarse Woody Debris: Managing Benefits & Fire Hazard in the Recovering Forest*, Attachment 8 to Plaintiff Sierra Club's Memorandum of Points and Authorities, p. 19; *see also* James K. Brown, et al., *Coarse Woody Debris and Succession in Recovering Forest*, Attachment 9 at pp. 1–2.

activities occur in that area), Plaintiff's administrative appeals were denied.

On July 1, 2003, this Court issued a temporary restraining order enjoining Defendants from taking any further steps to implement the Red Star Project in Duncan Canyon, and to that end prevented Defendants from advertising, offering timber for sale, or awarding any timber contracts within Duncan Canyon. On July 28, 2003, a hearing was held with respect to Plaintiffs' request for a preliminary injunction. At that time a stipulation was entered into by all parties to maintain the temporary restraining order in place until issuance of a written order on the requested preliminary injunction.

Because of issues raised by the parties with respect to rapid deterioration of the timber earmarked for logging and indications that recent proposed timber sales outside Duncan Canyon failed to garner any bidding whatsoever, a status conference was ordered by the Court to ensure that this matter remained in actual controversy. At that hearing, held June 17, 2004, the parties informed the Court that while logging was virtually complete on all areas outside Duncan Canyon, the Forest Service still intended to submit some 450 acres within Duncan Canyon for proposed logging. Defendants informed the Court that they believed that sale to remain commercially viable, and expressed their intent to proceed with that sale if not enjoined from doing so. Consequently the Court determined it would proceed with issuance of a written decision on the preliminary injunction sought by Plaintiffs.

Although Plaintiffs take issue with the Red Star Project for numerous reasons, for purposes of analyzing the present request for preliminary injunction, which is designed to halt any further implementation of the project, three key arguments advanced by Plaintiffs will be considered. First, Plaintiffs argue that the logging of larger trees, and the attendant slash debris left as a result of that logging, increases rather than decreases the risk of severe wildfire. Secondly, with respect to Duncan Canyon, Plaintiffs contend that Defendants cannot justify logging of that inventoried roadless area under any of the exceptions to the so-called "Roadless Rule", which permits logging of roadless areas to occur only under narrow circumstances. Thirdly, Plaintiffs maintain that the FEIS fails to monitor certain specified Management Indicator Species ("MIS"), as required by both the Framework and the Forest Plan.

## STANDARD

Certain prerequisites must be satisfied prior to issuance of a preliminary injunction. Under the so-called "traditional" standard, an injunction may be had if the court determines that (1) the moving party will suffer irreparable injury if the relief is denied; (2) there is a strong likelihood that the moving party will prevail on the merits at trial; (3) the balance of potential harm favors the moving party; and (4) the public interest favors granting relief. *International Jensen, Inc. v. Metrosound U.S.A.*, 4 F.3d 819, 822 (9th Cir.1993). Under the "alternative" standard, an injunction properly issues when a party demonstrates either: (1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted; or (2) the existence of serious questions going to the merits combined with a balancing of hardships tipping sharply in favor of the moving party. *Id.*, see also *Idaho Sporting Congress, Inc. v. Alexander*, 222 F.3d 562, 565 (9th Cir. 2000). The requirement for showing a likelihood of irreparable harm increases or decreases in inverse correlation to the probability of success on the merits, with these factors representing two points on a

sliding scale. *United States v. Nutri-cology, Inc.,* 982 F.2d 394, 397 (9th Cir.1992).

When the public interest is involved, such interest must be a necessary factor in the district court's consideration of whether to grant preliminary injunctive relief. *Caribbean Marine Services v. Baldrige,* 844 F.2d 668, 674 (9th Cir.1988). In addition, the Supreme Court has emphasized that in environmental cases, the balance of harms typically weighs in favor of issuing an injunction: "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Nevertheless there can be no presumption of environmental harm from alleged violations of an environmental statute. *See Amoco Production Co., v. Village of Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *Sierra Club v. Penfold,* 857 F.2d 1307 (9th Cir.1988).

Here a preliminary injunction is sought in the context of a lawsuit charging Defendants with violations of both NEPA and NFMA as well as provisions of the APA. NEPA imposes a procedural requirement that an agency contemplate the environmental impacts of its actions *Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1149 (9th Cir.1998), with a detailed environmental impact statement required for actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(c). An agency must take a "hard look" at the consequences, environmental impacts, and adverse environmental effects of a proposed action within an environmental impact statement, when required. *Kleppe v. Sierra Club,* 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

If an EIS adequately discloses such effects, NEPA's goal is satisfied. *Inland Empire Public Lands Council v. United States Forest Serv.,* 88 F.3d 754, 758 (9th Cir.1996). As the Ninth Circuit stated in *Inland Empire,* "NEPA exists to ensure a *process,* not to ensure any result." *Id.* (emphasis in original).

NEPA does not mandate that an EIS be based on a particular scientific methodology, nor does it require a reviewing court to weigh conflicting scientific data. *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 986 (9th Cir.1985). An agency must be permitted discretion in relying on the reasonable opinions of its own qualified experts, even if the court might find contrary views more persuasive. *See, e.g., Kleppe,* 427 U.S. at 410, n. 21, 96 S.Ct. 2718. NEPA does not allow an agency to rely on the conclusions and opinions of its staff, however, without providing both supporting analysis and data. *Idaho Sporting Congress,* 137 F.3d at 1150. Credible scientific evidence that contraindicates a proposed action must also be evaluated and disclosed. 40 C.F.R. § 1502.9(b).

NFMA requires that "resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i). Consequently all activities in USFS forests, including timber sales, must be determined to be consistent with the governing forest plan, which is a broad, programmatic planning document. *See, e.g., Wilderness Society v. Thomas,* 188 F.3d 1130, 1132 (9th Cir.1999).

The Forest Plan for the Tahoe National Forest was amended by the Sierra Nevada Forest Plan Amendment ("Framework"), which was signed in January of 2001. The stated purpose of the Framework, which provides guidance for eleven Sierra Neva-

da national forests in California and Nevada, includes 1) protecting, increasing, and perpetuating old forest ecosystems, as well as providing for the viability of native plant and animal species associated with old forest ecosystems; 2) managing fire and fuels and integrating fire and fuel management with other natural resource management objectives; and 3) maintaining and enhancing hardwood forest ecosystems in the lower westside of the Sierra Nevada.

A site specific project like the Red Star Project may proceed only if it is not only consistent with the Forest Plan but also has been analyzed under NEPA as discussed above. *See, e.g., Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1512 (9th Cir.1992).

■ Because neither NEPA nor NFMA contains provisions allowing a private right of action (*see Lujan v. National Wildlife Federation,* 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) and *Ecology Center Inc. v. United States,* 192 F.3d 922, 924 (9th Cir.1999) for this proposition under NEPA and NFMA, respectively), a party can obtain judicial review of alleged violations of NEPA and NFMA only under the waiver of sovereign immunity contained within the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. Under the APA, the court must determine whether, based on a review of the agency's administrative record, the EIS was "arbitrary and capricious," outside the scope of the agency's statutory authority, or otherwise not in accordance with the law. *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1356 (9th Cir. 1994). In conducting this review, the standard to be employed is decidedly deferential to the agency's expertise. *Id.* Although the scope of review for agency action is accordingly limited, such action is not unimpeachable. The reviewing court must determine whether there is a ration-al connection between the facts and resulting judgment so as to support the agency's determination. *Baltimore Gas and Elec. v. NRDC,* 462 U.S. 87, 105–06, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983), *citing Bowman Transp. Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

## ANALYSIS

### A. Plaintiffs are Likely to Prevail on the Merits

*1. Exacerbating Fire Risk*

■ According to the Sierra Nevada Framework, dead trees may be removed from Old Forest Emphasis Areas following a stand replacing event like the Star fire to the extent that such removal benefits landscape conditions for old forest structure and function. Plaintiffs argue that removing only the largest trees, and leaving slash from that removal along with the woody debris from smaller trees, would create the risk of severe fire since fire resulting from such readily flammable fuels would burn very intensely. According to Plaintiffs, this kind of intense fire would likely kill any recovering or newly planted forest, and severely damage the soil and seedbeds in the process, thereby halting regeneration and preventing a return to the old forest conditions mandated by the Framework as a precondition for post-fire logging. (*See* Declaration of Dr. Dennis Odion, pp. 9–12). Dr. Odion concludes that the extremity of fire behavior is primarily determined by very small woody material, and opines that the contribution of very large logs to fire severity and intensity is almost negligible. *Id.* at 4. Instead, according to Dr. Odion, larger logs generally burn only because of the availability of smaller fuels needed to ignite them and to sustain combustion. *Id.* According to Dr. Odion, removing larger fuels, and leaving large quantities of slash on the ground, creates a fuel complex re-

sembling "what would be created if one were trying to generate campfire or bonfire style combustion across the landscape." *Id.* at 5. He reasons that because the availability of fuels to flaming combustion is inversely proportional to their size, effective fuel reduction treatments in forests should focus on smaller trees, such as the smallest understory trees, as well as shrubs and lower tree limbs. *Id.* at 7.

Dr. Odion's conclusions in this regard appear to have support in the scientific literature. As indicated above, even the Forest Service's own studies indicate that over thirty to forty tons of small diameter fuel on the forest floor create "extreme fire hazard" as well as extreme resistance to control once a fire actually starts. (*See* n. 6, *supra*). By Defendants' own estimate, as much as 85 tons of flammable surface fuel, or more than twice that amount, will be present after the logging proposed by the Red Star Project has been completed. (FEIS, p. 57).

The Red Star Project FEIS argues that decreasing total fuel volumes (without regard to fuel size) correlates directly with a reduction in fire severity, and cites four scientific studies as support for that proposition. (FEIS, p. 85). In essence, Defendants claim that logging larger trees will significantly decrease the volume of dead standing biomass per acre, which they estimate ranges up to 523 tons per acre (with an average of 160 tons/acre). (FEIS, pp. 80–81). The problem with the four studies cited by Defendants in the FEIS, however, is that they do not appear to support the fuel reduction approach being advocated.

The first study cited, by Jimerson and Jones, for example, found that salvage logging of large fallen trees was irrelevant to reducing fire severity. That study in fact found that the "highest frequency of high severity fire occurred in [logged] stands

with no follow up fuels [slash] treatment....", indicating that "large coarse woody debris removal [i.e., large log removal] without additional fuels treatment increased the occurrence of high severity fire." (AR 7:3871). Similarly, Omi and Martinson admonished that fuel treatments removing only the largest logs "will be ineffective in the context of wildfire management." (AR 7:4237). Finally, Pollet and Omi advocate against removing large trees and leaving slash untreated, stating that "slash resulting from logging operations increases fire hazard..." and concluding that "harvests to reduce wildlife hazard will remove small-diameter trees in contrast to traditional timber harvests." (AR 7:4272, 4274).

While these studies are included within the Administrative Record considered in this case, and were reviewed again in response to public commentary questioning the wisdom of leaving residual logging slash, there is no indication that any views they expressed contrary to the logging proposed by the Red Star Project were duly weighed. The FEIS' Response to Comment 26 again discussed the studies enumerated above yet failed to disclose that they contained conclusions potentially contrary to the efficacy of the Project. (AR 2:1054–55). In addition, while another scientific study, by Kalabokidis and Omi, is also mentioned in Comment 26, that study in fact found that "thinning with no slash modification treatment is an inappropriate option because more fuel becomes available for combustion and thus contributes to extreme fire outcomes." (See Plaintiffs' Supplemental Brief, Exh. 3). Finally, the FEIS failed to consider the Forest Service's own studies indicating that the presence of slash in amounts less than half of that proposed here presented an extreme fire danger.[7] Consequently,

---

7. In addition, the Red Star Project FEIS fails     to acknowledge another Forest Service study,

while the FEIS concludes that "the preponderance of peer reviewed scientific information indicates that the proposed activities will help speed the recovery of the burned areas while also reducing future wildland fire severities," [8] without proper analysis of all the available scientific literature that conclusion appears suspect.

As indicated above, NEPA requires that an agency contemplate the environmental impacts of its action. *Idaho Sporting Congress v. Thomas,* 137 F.3d at 1149. Agencies must take a "hard look" at the consequences, environmental impacts, and adverse environmental effects of proposed actions. *Kleppe,* 427 U.S. at 421, n. 21, 96 S.Ct. 2718. By failing to adequately consider and evaluate adverse scientific opinion, the Red Star Project FEIS fails to meet NEPA requirements by taking the requisite "hard look".

In *Sierra Club v. Bosworth,* 199 F.Supp.2d 971 (N.D.Cal.2002), like the present case, the Forest Service argued that post-fire salvage burning was needed to prevent a future severe fire. Also similar to the case presently before the Court, in *Bosworth* the plaintiffs asserted that the EIS violated NEPA by failing to disclose the lack of scientific evidence supporting that proposition. The *Bosworth* court concluded that the EIS at issue in that case violated NEPA "by failing to disclose and analyze scientific opinion in support of and in opposition to the conclusion that the... project will reduce that intensity of future wildfires in the project area." *Id.* at 981.

█ The conclusion reached in *Bosworth* appears equally applicable here. Even though agency decisions are entitled to deference, NEPA does not allow Defendants to rely on its own opinions and conclusions without providing hard data and analysis for both the public and the court to review. *Idaho Sporting Congress v. Thomas,* 137 F.3d at 1150, *see also Marble Mountain Audubon Society v. Rice,* 914 F.2d 179, 182 (9th Cir.1990) (agencies cannot make conclusory statement in an environmental impact statement "without any apparent study or supporting documentation"). NEPA specifically requires Defendants to objectively evaluate and disclose credible scientific evidence that contradicts its proposed course of action. 40 C.F.R. § 1502.9(b).

### 2. "Roadless Rule" Violations

The Duncan Canyon Inventoried Roadless Area falls within the area designed by the Red Star Project for salvage logging. Indeed, because logging has already essentially been completed outside Duncan Canyon, examination of the so-called "Roadless Rule" (36 C.F.R. § 294.10), is critical. The Roadless Rule permits timber cutting only if the logging is limited to "generally small diameter timber" and allows logging only for narrowly defined purposes such as enhancing roadless area characteristics. It provides in pertinent part as follows:

(a) Timber may not be cut, sold, or removed in inventoried roadless areas of the National Forest System, except as provided in paragraph (b) of this section.

(b) Notwithstanding the prohibition in paragraph (a) of this section, timber may be cut, sold or removed in inventoried roadless areas if the Responsible Official determines that one of the following circumstances exist. The cutting, sale, or removal of timber in these areas is expected to be infrequent.

(1) **The cutting, sale, or removal of timber of generally small diameter**

---

by McIver and Starr, which found no scientific evidence that post-fire salvage logging reduces future intensity. *See* Declaration of Dr. Dennis C. Odion, p. 6.

**8.** *See* FEIS response to Comment 32, AR 2:1058.

**timber is needed for one of the following purposes** and will maintain or improve the roadless area characteristics as defined in § 294.11.

(i) To improve threatened, endangered, proposed or sensitive species habitat; or

(ii) **To maintain or restore the characteristics of ecosystem composition and structure, such as to reduce the risk of uncharacteristic wildfire effects**, within the range of variability that would be expected to occur under natural disturbance regimes of the current climactic period.

36 C.F.R. § 294.13 (emphasis added).

Plaintiffs claim that the Red Star Project violates the Roadless Rule in several respects. For purposes of this Order, the Court will focus on two arguments: first, the Project's alleged failure to limit proposed logging to "generally small diameter timber", and secondly, Plaintiff's contention that proposed logging will increase rather than reduce the risk of uncharacteristic wildfire effects.

Turning initially to the question of whether "generally small diameter timber" is targeted for removal, the provisions of the Roadless Rule fail to specifically define that term. Further, the various documents governing the project are inconclusive and perhaps even inconsistent. The Record of Decision for the Red Star Restoration Project in Duncan Canyon defined "small" trees to mean those with a diameter of between 11 and 24 inches. (See Attachment 5 to Plaintiff Earth Island's Memorandum of Points and Authorities, p. 5). The FEIS for the overall Red Star Project, however, describes trees over thirty inches in diameter as "very large". (FEIS, p. 204). Elsewhere in the FEIS,

however, the FEIS states that a "small" tree is one ten inches in diameter or less. (*Id.* at 32). Moreover, the FEIS for the Framework (which applies to the Forest Plan and, in turn, to the Project at issue here), defines trees 12 to 24 inches in diameter as "large".[9]

After Plaintiffs argued, in their administrative appeal, that trees up to 24 inches should not be considered "small", the Forest Service countered with the assertion that "over 94% of the fire-killed trees proposed for harvest are considered to be small . . ."[10] That contention appears misleading, however. In the Duncan Canyon Inventoried Roadless Area, for example, the Forest Service indicated that its treatment plan only encompassed the removal of trees greater than 10 inches in diameter. The overall Red Star Project appears to focus on even bigger trees in excess of 15 inches in diameter. (See AR 4:2246, 2254). Moreover, the 94 percent figure cited by the Forest Service appears to be a reference to field examination results finding that some 94 percent of fire burned trees in the project area were less than 24 inches in diameter. (AR 4:1973).

Because the Forest Service does not even anticipate removing trees from Duncan Canyon smaller than 10 inches, including all those trees in the calculation of overall timber removal from that area appears erroneous. Consequently, even by the Forest Service's own definition, it is questionable whether the proposed harvest within Duncan Canyon is limited to "generally small diameter timber". In addition, and even more fundamentally, the definition of that term itself is uncertain and the record herein appears internally inconsistent on just what "small diameter timber" means.

9. *See* Attachment 30 to Plaintiff Earth Island's Memorandum of Points and Authorities.

10. *See* Attachment 16 to Plaintiff Earth Island's Memorandum of Points and Authorities.

While Plaintiffs have unquestionably raised serious questions about Defendants' compliance with the Roadless Rule in terms of the size of timber to be cut within Duncan Canyon, even aside from that debate, the Roadless Rule does not permit logging of any kind except in narrowly specified circumstances, including efforts to reduce wildfire risk. As already discussed above, Defendants have failed to take the "hard look" required by NEPA at scientific studies which suggest that the timber removal proposed actually increases, not reduces, fire risk. In the absence of such examination, Defendants' compliance with the Roadless Rule's directive that wildfire risk be *reduced* appears suspect. In addition, to the extent that the project may actually increase fire risk, Defendants can hardly say that the project enhances the other main exception identified by the Roadless Rule in permitting logging; namely, to improve threatened, endangered, proposed, or sensitive species habitat. The specter of bonfire-like combustion across the landscape, as raised by Plaintiffs, would hardly meet that objective.

*3. Monitoring of Management Indicator Species ("MIS")*

Both the Sierra Nevada Framework and the Tahoe Forest Plan require population monitoring and annual monitoring reports for MIS. The Framework expressly requires annual population monitoring for MIS, and it lists each species "for which population trend data is expected to be obtained." AR 10:6122, 10:6134, 10:6156. Those species include the mountain quail, wild turkey, pileated woodpecker, hairy woodpecker, golden eagle and gray squirrel.[11] Moreover, the Forest Plan states that "[p]opulation trends of the MIS will be monitored," and requires the Forest Service to produce annual monitoring for each MIS at issue. Declaration of Diana Craig, Exhibit E at VI–4, VI–8–12. The Forest Plan has additional MIS designated, including the pacific fisher, the American marten and the Sierra Nevada red fox.

Despite the mandatory language employed by both the Framework and the Forest Plan, Defendants contend that population survey information is not required so long as effects to MIS habitat are adequately analyzed and disclosed. According to the defense, this habitat management approach has been upheld by the Ninth Circuit in *Inland Empire Public Lands Council v. United States Forest Service*, 88 F.3d 754, 761–62 (9th Cir.1996). Defendants argue that because the Red Star Project will not diminish habitat for MIS, population monitoring is not required, and accordingly the admitted absence of provision for such monitoring in the Red Star Project FEIS does not violate the provisions of either the Framework, the Forest Plan or the NFMA.

Plaintiffs, on the other hand, contend that applicable NFMA regulations[12] require the monitoring of MIS at a site specific level,[13] and that accordingly such

---

**11.** *See* Attachment 3 to Plaintiff Sierra Club's Points and Authorities at E–64 (Framework FEIS chart indicating with checkmarks the MIS species for which population monitoring is required).

**12.** 36 C.F.R. § 219.19 requires the Forest Service to monitor the population trends of MIS and the relationship of MIS to habitat changes. In addition, § 219.26 requires the

Forest Service to gather and keep "quantitative data" for MIS.

**13.** *See Utah Envtl. Congress v. Bosworth,* 372 F.3d 1219, 1226 (10th Cir.2004); *Forest Guardians v. U.S. Forest Service,* 180 F.Supp.2d 1273, 1280 (D.N.M.2001); *Utah Envtl., Congress v. Zieroth,* 190 F.Supp.2d 1265, 1270 (D.Utah 2002).

site-specific monitoring is necessarily required under the Framework and Forest Plan. Citing *Sierra Club v. Martin*, 168 F.3d 1 (11th Cir.1999), Plaintiffs contend that the NFMA regulations create a "general obligation that the Forest Service gather and keep [MIS] data to ensure species diversity in the planning area." *Id.* at 5. Accordingly, consistent with the *Martin* court's holding, Plaintiffs argue that the Red Star Project's violation of the regulations is arbitrary and capricious, and consequently must be set aside under the APA, 5 U.S.C. § 706(2)(A). *Id.* at 6–7. Plaintiffs contend that habitat analysis is permitted only under limited circumstances not applicable here.

■ Habitat analysis is an acceptable substitute for population trend data if there is enough underlying data to support such an analysis, along with any resulting conclusion that the project area includes enough habitat essential for survival of the MIS species in question. *Inland Empire*, 88 F.3d at 761. Here there appears to be a lack of such underlying data.[14] The Sierra Nevada Framework, which by operation of law is part of the Tahoe Forest Plan, indicates a lack of MIS habitat analysis:

"Many uncertainties exist about the status and fate of MIS and species at risk. Basic information on distribution, population status and habitat relationships is lacking for most MIS and species at risk, creating uncertainties about the adequacy of and effectiveness of various conservation measures . . ."

Framework FEIS, Attachment 3 to Plaintiff Sierra Club's Memorandum of Points and Authorities, at E–62.

Significantly, the Framework recognizes that only after a period of annual MIS population monitoring will enough information be present about important habitat characteristics so as to dispense with such annual monitoring. *Id.* at E–63. Even more importantly, the Red Star Project FEIS itself indicates that several of the MIS species designated in the Framework and Plan are "population trend unknown", consequently recognizing the lack of the requisite population data.[15]

Because there appears to be no available data for numerous MIS in the project area, and because the Forest Service lacks the necessary underlying information for use of a habitat analysis in lieu of actual population studies, the Red Star Project's failure to incorporate MIS population monitoring appears to run afoul of the requirements of both the Framework, the Forest Plan and the NFMA.

## B. Irreparable Injury

■ As discussed above, Plaintiffs have shown a probability of success on the merits with respect to their claims that the Red Star Project increases rather than decreases fire risk, violates the so-called "Roadless Rule", and fails to properly

---

**14.** *Inland Empire* is also distinguishable because in that case, unlike the matter at bar, no Forest Plan requirement for actual population monitoring was involved. Instead, both *Inland Empire* and another case cited by Defendants, *Indiana Forest Alliance v. U.S. Forest Service*, 325 F.3d 851 (7th Cir.2003), dealt only with NFMA regulations and not with the requirements of a forest plan itself. As the *Indiana Forest Alliance* court stated: "Unlike *Sierra Club v. Martin* and other cases that reached the opposite conclusion (that actual population monitoring is necessary), the plaintiffs have not identified any language in the Plan for the Hoosier National Forest that specifically requires the Forest Service to inventory the populations of management indicator or sensitive species before taking a site-specific action." *Id.* at 864.

**15.** These include the mountain quail, wild turkey, and pileated woodpecker. See FEIS, pp. 51–56.

monitor MIS. In order to qualify for the requested injunctive relief, however, Plaintiffs must still make some showing of irreparable injury.

The parties have represented to the Court that logging has essentially been completed in areas of the Tahoe National Forest outside the Duncan Canyon Inventoried Roadless Area. As to those areas, where any harm resulting from Defendants' logging activities has already occurred, any showing of imminent irreparable injury cannot be made, and consequently a preliminary injunction cannot be had. With regard to Duncan Canyon, however, Defendants maintain that they will commence logging operations if not enjoined from doing so.

As Plaintiffs point out, once trees are removed from the landscape, they cannot be replaced and the flammable slash debris also becomes permanent as to those areas, like most of Duncan Canyon, where no clean-up activities are planned. (*see* n. 2, *supra*). Plaintiffs have demonstrated that the Red Star Project FEIS violates NEPA requirements by failing to take the requisite "hard look" at scientific opinion contrary to the logging methods being proposed. Courts have recognized that timber cutting carried out in contravention of NEPA procedures and other environmental laws causes irreparable damage. *Portland Audubon Society v. Lujan*, 795 F.Supp. 1489, 1509 (D.Or.1992), *aff'd*, *Portland Audubon Society v. Babbitt*, 998 F.2d 705 (9th Cir.1993). Hence the proposed logging in Duncan Canyon is enough in and of itself to satisfy the irreparable harm component of Plaintiffs' preliminary injunction request. The increased risk and intensity of fire that may be caused by such logging may both elevate the likelihood of extreme fire and damage critical habitat for certain MIS whose population, in the absence of proper monitoring, remains unknown.

## C. Balance of Hardships

■ The balance of hardships clearly tip in favor of granting a preliminary injunction in this case. The area proposed for logging ·in Duncan Canyon, at about 450 acres, is relatively small and hence the commercial value of any trees removed would appear negligible. Plaintiffs, on the other hand, can point to increased fire risk in an area already subject to increased protection through the so-called Roadless Rule. In addition, as recognized by the Red Star Project FEIS itself, Duncan Canyon has been proposed as a potential "Wilderness Area" under the California Wild Heritage Wilderness Act of 2002. (FEIS at 186). Because any potential wilderness suitability would be destroyed by logging,[16] that represents another reason why the balance of hardships militates against allowing logging to proceed within Duncan Canyon.

## D. Public Interest

To the extent Plaintiffs have demonstrated that implementation of the Red Star Project may increase the likelihood of severe fire, such an increased risk is clearly not in the public interest. In addition, because an injunction requiring Defendants to comply with the statutory obligations of the NFMA, NEPA, the APA and the Roadless Rule is clearly in the public interest (*See Seattle Audubon Society v. Evans*, 771 F.Supp. 1081, 1096

---

**16.** Under the Wilderness Act of 1964, a "wilderness" is defined as an area "untrammeled by man", a characteristic that would surely be removed by extensive logging. (*See* 16 U.S.C. § 1131(c)).

(W.D.Wash.1991)), that factor also weighs in favor of granting a preliminary injunction in this case.

## CONCLUSION

For the reasons stated above, a preliminary injunction enjoining Defendants' proposed logging activities within the Duncan Canyon Inventoried Roadless Area is GRANTED.[17] Defendants are hereby enjoined, during the pendency of this litigation, from taking any further action to implement the Red Star Restoration Project in Duncan Canyon, including advertising, offering timber for sale, awarding any timber sale contracts, removing logs from any part of the Duncan Canyon Inventoried Roadless Area, or taking any steps to commence such action, such as the grading for or construction of roads within Duncan Canyon. No bond of Plaintiffs shall be required.[18]

IT IS SO ORDERED.

---

**17.** While the Court notes that Defendants moved for summary judgment on their own behalf in opposition to Plaintiffs' Motion for Preliminary Injunction, because the Court has ruled in favor of Plaintiffs on their request for injunctive relief, summary judgment as to Defendants is necessarily denied and need not be further considered herein. In addition, for purposes of the instant Motion, Plaintiffs' Motion to Strike certain declarations proffered by Defendants is also denied. The declarations in question were not critical to the Court's decision in this matter.

**18.** In environmental logging cases like this one, the Ninth Circuit has imposed little or no bond given the fact that plaintiffs are essentially acting as private attorneys general. *See, e.g., Tenakee Springs v. Clough*, 915 F.2d 1308, 1314, n. 4 (9th Cir.1990) (no bond required for preliminary injunction against logging until Forest Service prepared adequate EIS).